**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

CAMEO DAWN MONGELLUZZO,

               Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,

               Defendant.

Case No. 2:13-cv-00610-SLG

<u>**DECISION AND ORDER**</u>

      Cameo Dawn Mongelluzzo initiated this Social Security action in federal district court after exhausting administrative remedies.  The matter has been fully briefed by the parties.[1]  Ms. Mongelluzzo requested oral argument;[2] however, oral argument was not necessary to the Court's resolution of the issues raised by Ms. Mongelluzzo.  For the reasons set forth below, this matter will be reversed and remanded to the Commissioner of Social Security for the calculation and award of benefits, and the oral argument that was previously scheduled will be vacated.

---

[1] Docket 19 (Mongelluzzo Br.); Docket 21 (Def. Br.); Docket 25 (Reply).

[2] Docket 19 (Mongelluzzo Br.).

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Mongelluzzo is 40 years old and is a high school graduate.[3]   At different times between May 2002 and May 2009, she worked as a pizza delivery person, a grocery store clerk, a janitor, and an assistant at a charter school.[4]   From May 2009 to January 2010, she worked as a teacher at a daycare.[5]   Shortly thereafter, in the spring of 2010, she enrolled full time at Paradise Valley Community College.[6]   For each of the spring and fall semesters in 2010 and 2011, Ms. Mongelluzzo took 10 or 12 credit-hours of classes.[7]   As of December 2011, she had earned approximately 50 of the 65 credits needed for an associate degree in fine arts.[8]   She hopes to become a photographer.[9]

Ms. Mongelluzzo suffers from certain mental impairments, which are the focus of this appeal.[10]   The record reflects that Ms. Mongelluzzo has a history of childhood abuse,[11] and around 2004, she attempted suicide on two different occasions.[12]   Ms.

---

[3] *See* Docket 11 (Administrative Record [hereinafter A.R.]) 51, 57.

[4] A.R. 243.

[5] A.R. 58, 62, 243.

[6] A.R. 58–59.  It appears Ms. Mongelluzzo took some college classes before the spring of 2010. *See, e.g.*, A.R. 386 (11/10/08 Behavioral Service Health Plan) ("Cameo is currently working full time as a teacher in a day care for children.  She is currently attending classes.").

[7] A.R. 55–56, 58–59.  Twelve credit-hours is considered full time.  A.R. 59.

[8] A.R. 55–56.

[9] A.R. 55.

[10] *See* Docket 19 at 4 (Mongelluzzo Br.) ("Although Mongelluzzo suffers from some physical impairments, her mental impairments are the focus of this appeal.").

[11] A.R. 391, 405.

[12] A.R. 405.

Mongelluzzo has sought treatment for her mental impairments, but symptoms persist even with medication.

**I.    Ms. Mongelluzzo's Application for Supplemental Security Income.**

On April 9, 2010, Ms. Mongelluzzo filed an application for Supplemental Security Income ("SSI")[13] with the State of Arizona Disability Determination Services ("DDS") based on a disability beginning that same day.[14]  She listed several impairments that limit her ability to work, including the following mental impairments: depression, dissociative identity disorder, anxiety disorder, borderline personality disorder, post traumatic stress disorder ("PTSD"), and seriously mentally ill diagnosis.[15]  Both Ms. Mongelluzzo and her husband submitted function reports in support of Ms. Mongelluzzo's application.[16]

On August 12, 2010, DDS denied Ms. Mongelluzzo's application for SSI.[17]  The following month, Ms. Mongelluzzo filed a request for reconsideration,[18] which was denied on November 8, 2010.[19]  On January 18, 2011, Ms. Mongelluzzo requested a

---

[13] A.R. 187.  That same day, Ms. Mongelluzzo also filed an application for disability insurance benefits ("DIB").  A.R. 183.  However, the administrative law judge determined that Ms. Mongelluzzo was not eligible for DIB because she could not prove she was disabled prior to the expiration of her disability insured status in 1995.  *See* A.R. 23, 47–48.  Ms. Mongelluzzo does not contest this finding on appeal.  *See* Docket 19 at 3 (Mongelluzzo Br.).

[14] A.R. 203.  Ms. Mongelluzzo alleged a disability onset date of February 15, 2005 in her application, but she later amended this to April 9, 2010.  A.R. 48, 187, 203.

[15] A.R. 219.

[16] A.R. 206–13, 233–42.

[17] A.R. 122.

[18] A.R. 126.

[19] A.R. 131.

hearing before an administrative law judge ("ALJ").[20]  Ms. Mongelluzzo's hearing took

place on December 15, 2011 in Phoenix, Arizona before ALJ Earl C. Cates, Jr.[21]

## II.    The Administrative Record.

The administrative record before the ALJ reflects the following:

### A. Ms. Mongelluzzo's Mental Health Treatment Records (2006–2011).

In November 2006, Ms. Mongelluzzo began receiving treatment through

Arizona's mental health care system, variously called Value Options, Magellan, or

Southwest Network.[22]  She met with a doctor on at least 10 occasions from 2006

through 2008.[23]  Ms. Mongelluzzo's September 24, 2007 "At Risk Crisis Plan" indicates

that she suffers from PTSD and dissociative identity disorder, with symptoms including

"startle response, avoidance, triggers and flashbacks, depression and dissociative

episodes[,] anxiety and blackouts."[24]  However, the records from 2006 to 2008 also

reflect that Ms. Mongelluzzo's mental condition generally was stable.[25]  On several

---

[20] A.R. 135.

[21] A.R. 47.

[22] A.R. 326–92, 428–42, 486–523.

[23] *See* A.R. 357–92.

[24] A.R. 391.  Dr. Jehangir Bastani later added a diagnosis of borderline personality disorder. *See* A.R. 345.

[25] *See, e.g.*, A.R. 381–82 (1/24/07 treatment notes) (indicating that Ms. Mongelluzzo stated she was "feeling very good" and that she is "stable" with "anxiety symptoms in control"); A.R. 375–76 (6/29/07 treatment notes) (stating Ms. Mongelluzzo's mood is "good" and she "feels overall stable"); A.R. 366 (3/28/08 treatment notes) (indicating Ms. Mongelluzzo's dissociative identity disorder and PTSD are "stable"); *see generally* A.R. 357–92.

visits, she was given a Global Assessment Functioning ("GAF") score, which was always between 60 and 70.[26]

On March 13, 2009, Ms. Mongelluzzo met with Dr. Stolzberg, whose notes indicate that Mr. Mongelluzzo is "doing well" and "able to manage work – school – family."[27]  Dr. Stolzberg gave Ms. Mongelluzzo a GAF score of 80.[28]

On June 3, 2009, Ms. Mongelluzzo had her first appointment with Dr. Jehangir Bastani.[29]  Dr. Bastani's notes from that visit indicate the severity Ms. Mongelluzzo's symptoms was "normal."[30]  However, when Ms. Mongelluzzo met with Dr. Bastani on August 6, 2009, Ms. Mongelluzzo's mental condition had worsened considerably.  Dr. Bastani's notes indicate that Ms. Mongelluzzo "disintegrated after the early part of the interview."[31]  She "abruptly stopped, got drowsy and spoke in a soft voice: not feeling good."[32]  Her head slumped to the left side, her speech became slurred, and Dr. Bastani

---

[26] *See* A.R. 360, 364, 366, 370, 376, 380, 382, 384.  GAF ranks a person's psychological, social, and occupational functioning on a scale of 0 to 100, in groups of ten.  *See* Docket 19 at 8 n.11 (Mongelluzzo Br.) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (Michael B. First ed., 4th ed. 2000) [hereinafter *DSM*]); Docket 21 at 3 n.5 (Def. Br.) (same).  A GAF score between 61 and 70 indicates a person is "generally functioning pretty well."  *DSM* at 34.  A GAF score between 51 and 60 indicates "[m]oderate symptoms [or] . . . moderate difficulty in social, occupational, or school functioning."  *Id.*  Ms. Mongelluzzo points out in her opening brief that "the latest *DSM* edition drops the GAF rating system."  Docket 19 at 8 n.11 (Mongelluzzo Br.).

[27] A.R. 355.

[28] A.R. 356.  A GAF score between 71 and 80 indicates a person's symptoms are "transient and expectable reactions to psychological stressors . . . no more than slight impairment in social, occupational, or school functioning."  *DSM* at 34.

[29] A.R. 351–52.

[30] A.R. 351.

[31] A.R. 350.

[32] A.R. 349.

observed the "emergence of [her] alternate personality."[33]  Dr. Bastani characterized the severity of Ms. Mongelluzzo's symptoms as "severe," and he gave her a GAF score of 30.[34]  But two weeks later, on August 19, 2009, Dr. Bastani observed a "change for the better" in Ms. Mongelluzzo's condition and characterized the severity of her symptoms as "mild."[35]

From October 2009 through April 2011, Ms. Mongelluzzo met with Dr. Bastani on at least 12 occasions.[36]  Dr. Bastani generally characterized the severity of Ms. Mongelluzzo's symptoms as either "mild" or "moderate," and he consistently assessed a GAF score of 50 or 52.[37]  Dr. Bastani's notes from September 22, 2010 state that Ms. Mongelluzzo "still is highly stressed" and "not capable of working full time over a period of time."[38]  And his notes from April 20, 2011—the last patient visit between Ms. Mongelluzzo and Dr. Bastani that is documented in the record—indicate that Ms. Mongelluzzo suffered from ongoing nightmares, was paranoid and delusional, and was stressed by her college classes.[39]

---

[33] A.R. 349–50.

[34] A.R. 350.  A GAF score between 21 and 30 indicates "serious impairment in communication or judgment [or] . . . inability to function in almost all areas."  *DSM* at 34.

[35] A.R. 347–48.

[36] *See* A.R. 326–46, 435–38, 497–523.  Ms. Mongelluzzo also met with Dr. Suhaila Al Haddad on November 15, 2010.  A.R. 515.

[37] *See* A.R. 326–46, 435–38, 497–523.  A GAF score between 41 and 50 indicates "[s]erious symptoms [or] . . . serious impairment in social, occupational, or school functioning."  *DSM* at 34.  A GAF score between 51 and 60 indicates "[m]oderate symptoms [or] . . . moderate difficulty in social, occupational, or school functioning."  *Id.*

[38] A.R. 522.

[39] A.R. 497–98.

On August 1, 2011, Ms. Mongelluzzo met with Dr. Jon Allison, whose notes state that Ms. Mongelluzzo's "psychiatric symptoms are controlled at the present time."[40]  But on October 27, 2011—the last mental health check-up documented in the record—Dr. Beth Wadman observed that Ms. Mongelluzzo "seems to be dissociated several times during the Interview."[41]   Dr. Wadman also noted that Ms. Mongelluzzo was "very worried that she will have an episode of memory loss that she has had in the past."[42]  Dr. Wadman characterized the severity of Ms. Mongelluzzo's symptoms as "moderate."[43]

**B. Other Medical Evidence.**

*i.  Consultative Examination by Dr. Jacqueline Worsley (June 18, 2010).*

After Ms. Mongelluzzo filed her application for SSI, DDS referred her to Dr. Jacqueline Worsley for a psychological consultative examination ("CE"), which took place on June 18, 2010.[44]   Dr. Worsley evaluated Ms. Mongelluzzo's mental health "based on a clinical interview, mental status assessment, Magellan records, and the Function Report."[45]

---

[40] A.R. 489.

[41] A.R. 486.

[42] A.R. 486.

[43] A.R. 487.

[44] A.R. 404–09.

[45] A.R. 404.

Dr. Worsley diagnosed Ms. Mongelluzzo with PTSD and dysthymic disorder, and a rule-out of dissociative identity disorder and borderline personality disorder.[46]   Dr. Worsley's report states: "[Ms. Mongelluzzo's] symptoms appear to pose difficulties with her being consistent in regards to school, work, and her presence in the family.  [Ms. Mongelluzzo] reported experiencing trauma during her childhood, but she did not wish to disclose details during this examination."[47]   The report further states that Ms. Mongelluzzo's "long-term memory appeared intact," but "her ability to retain information for shorter periods appeared compromised."[48]   Dr. Worsley opined that "[i]n a work setting, [Ms. Mongelluzzo's] ability to concentrate and remember some information would be compromised."[49]

### ii.   Case Analysis by Dr. Heather Barrons (August 2, 2010).

On August 2, 2010, Dr. Heather Barrons reviewed Ms. Mongelluzzo's file for DDS.[50]   In this state agency review, Dr. Barrons opined that Ms. Mongelluzzo appears to have a severe medically determinable mental impairment; however, "she appears to retain the ability to carry out at least simple unskilled work tasks."[51]   Ten days after Dr. Barrons conducted her case analysis, DDS denied Ms. Mongelluzzo's SSI application.[52]

---

[46] A.R. 407.

[47] A.R. 407.

[48] A.R. 408.

[49] A.R. 408.

[50] A.R. 93–94.

[51] A.R. 94.

[52] A.R. 122.

### iii. Case Analysis by Dr. Sheri Tomak (November 4, 2010).

On November 4, 2010, Dr. Sheri Tomak reviewed Ms. Mongelluzzo's file for DDS as part of Ms. Mongelluzo's request for reconsideration of her SSI application.[53]   In this second state agency review, Dr. Tomak concluded that although the available data suggests Ms. Mongelluzzo has some moderate limitations as a result of her mental impairments, she "is able to meet the basic mental demands of competitive, remunerative, unskilled work on a sustained basis."[54]   Four days after Dr. Tomak conducted her case analysis, DDS denied Ms. Mongelluzzo's request for reconsideration.[55]

### iv. Assessment by Dr. Beth Wadman (December 7, 2011).

Roughly one week prior to Ms. Mongelluzzo's hearing before the ALJ, Dr. Beth Wadman completed a two-page form assessment of Ms. Mongelluzzo's ability to perform work-related activity.[56]   Dr. Wadman opined that Ms. Mongelluzzo's mental impairments impose "severe" limitations on her ability to "[r]espond to customary work pressures" and to "[c]omplete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number/length of rest periods."[57]   Dr. Wadman further opined that Ms.

---

[53] A.R. 113–14.

[54] A.R. 113–14.

[55] A.R. 131.

[56] A.R. 524–25.  Dr. Wadman treated Ms. Mongelluzzo on October 27, 2011.  *See supra* text accompanying notes 41–43.  And Ms. Mongelluzzo testified at the hearing that Dr. Wadman was prescribing her medications for her mental impairments.  A.R. 70–71.

[57] A.R. 524–25.  The form Dr. Wadman filled out defines "severe" as "extreme impairment of ability to function."  A.R. 524.

Mongelluzzo's mental impairments impose "moderately severe" limitations on her ability to perform a variety of other tasks on a sustained basis in a routine work setting, including simple and repetitive tasks.[58]

### C. Non-Medical Evidence.

    *i.   Certification of Psychological Disability (September 22, 2010).*

Dr. Bastani completed a Certification of Psychological Disability dated September 22, 2010 on Ms. Mongelluzzo's behalf for Paradise Valley Community College.[59]   Dr. Bastani indicated that Ms. Mongelluzzo's mental impairments moderately impact her ability to engage in numerous major life activities, including concentrating, memory, managing distractions, attending class regularly and on time, and stress management.[60] Dr. Bastani stated that Ms. Mongelluzzo's symptoms persist with medication, and he described her prognosis as "fair."[61]   He further stated that Ms. Mongelluzzo's memory and concentration suffer when her anxiety is high; he recommended that Ms. Mongelluzzo be given adequate time to complete assignments and suggested that note taker services would be helpful.[62]

    *ii.  Statement of Mike Zajac (January 5, 2011).*

---

[58] *See* A.R. 524–25.  The form Dr. Wadman filled out defines "moderately severe" as "an impairment which seriously affects ability to function."  A.R. 524.

[59] A.R. 526–29.  Dr. Bastani also completed a certification dated July 29, 2010.  A.R. 530–33. This earlier certification does not differ significantly from the one dated September 22, 2010.

[60] A.R. 528.

[61] A.R. 528.

[62] A.R. 529.

Mike Zajac, one of Ms. Mongelluzzo's teachers at Paradise Valley Community College, wrote a letter dated January 5, 2011 discussing accommodations he made for Ms. Mongelluzzo in an art history class.[63]   The letter states that "[d]uring administration of the class exams, which are conducted via digital slides with timers, [Mr. Zajac] noticed that [Ms. Mongelluzzo] was having difficulty with the speed of the material."  Mr. Zajac decided to allow Ms. Mongelluzzo to take her exams via a paper copy, and he reminded her that she had the entire class period to complete the exams. Subsequently, Ms. Mongelluzzo's "performance on the exams . . . markedly improved."[64]   The letter concludes:

> [Ms. Mongelluzzo] has indicated to me that she will likely be seeking assistance from the [Disability Resource Center] in regards to a note taker and, potentially, extra time on examinations in her other classes.  I would recommend both of these adjustments for her, as I believe that they will significantly positively impact her performance in a course.[65]

## III.   Testimony at the Hearing.

Ms. Mongelluzzo's hearing before the ALJ lasted approximately one and one-half hours.[66]   Ms. Mongelluzzo, represented by an attorney, and an independent vocational expert ("VE") testified.[67]

Ms. Mongelluzzo testified that she, along with her husband and their four children, lives in a house with her parents.[68]   She stated that she left her job as a

---

[63] A.R. 297.

[64] A.R. 297.

[65] A.R. 297.

[66] *See* A.R. 47, 81.

[67] A.R. 47.

daycare teacher in January 2010 because she began "having trouble remembering going to and coming home from work."[69]  She stated she enrolled in college full time in the spring of 2010 and has not made any work attempts since then.[70]  At this point, the ALJ had Ms. Mongelluzzo leave the room in order to have an off-record discussion with Ms. Mongelluzzo's attorney.[71]  Back on the record, the following dialogue ensued:

> **ALJ:**  Okay.  We had the claimant go outside the hearing and Counsel and I discussed this case.  And it appears to me from the testimony the claimant is attending school on a full time basis.
> And she's been doing that since the application for SSI.  She's made a lifestyle choice to attend school rather than work.  And in the previous three years she was able to work at the substantial gainful activity level.  And –
>
> **Atty:**  As the Court is aware I'd like to make –
>
> **ALJ:**  Okay.
>
> **Atty:**  -- a motion at this point.
>
> **ALJ:**  Don't interrupt me, Counsel, until I finish.
>
> **Atty:**  I wasn't aware you'd finished.
>
> **ALJ:**  Okay.  I'm not finished.  I'll let you – I'll give you an opportunity to say what you want.  And what my plan is to finish the testimony here and I know Counsel is not happy with my assessment that she is attending school on a full time basis rather than working so I'm going to give Counsel the opportunity to speak his mind.  Go ahead, Counsel.

---

[68] A.R. 52–53.

[69] A.R. 58; *see also* A.R. 73 ("I would show up at work not remembering leaving and it was not always my day to work.  Other times in work I would not know how long I had been in a class or who had picked up the children.").

[70] A.R. 58–59.  Ms. Mongelluzzo testified that her husband is also a full-time student.  A.R. 55.

[71] *See* A.R. 59.

**Atty:**  Thank you, Judge.  After we went off the record to quote the ALJ directly the chances of me granting this case are slim to none.  That was based on what the ALJ just stated about the claimant going to school.  I pointed out that the regulations specifically say that the Agency will not [judge] a claimant's ability to work based on the ability to go to school.

That said the point is that the ALJ has already pre-judged this case by telling me the chances are slim to none in advance of hearing one single word of the claimant's symptom testimony.  I therefore move that the ALJ recuse himself from hearing this case.

**ALJ:**  Okay.  I'm going to deny the request to recuse myself.  I haven't finished with the testimony yet but that's what I'm looking at here.  It looks to me that the claimant has made an exchange that she's going to school full time.  She's just not available for work.[72]

Following this exchange, the ALJ had the VE classify Ms. Mongelluzzo's past work and then continued to question Ms. Mongelluzzo.[73]

Ms. Mongelluzzo testified that the primary medical conditions that prevent her from working are her "mental diagnoses" of "[d]epression, anxiety, borderline personality disorder, dissociative identity disorder, [PTSD]."[74]  She described her class schedule and indicated that it takes her longer than is typical to finish her homework.[75]  With respect to her daily routine, she testified that she and her husband try to coordinate their schedules so that one of them is available to care for the children.[76]  She stated that in a typical week, she cooks five meals, does thirteen loads of laundry, sweeps and mops

---

[72] A.R. 59–60.

[73] *See* A.R. 60–62.

[74] A.R. 63.  Ms. Mongelluzzo also indicated the she suffers from certain physical impairments, including carpal tunnel syndrome, obesity, high cholesterol, high blood pressure, and insomnia. A.R. 63–64.

[75] *See* A.R. 64–67.

[76] A.R. 67.

the floors, shops for groceries every day, and drives thirty miles.[77]  She also does a lot of reading for school.[78]

   Ms. Mongelluzzo testified that Dr. Wadman was prescribing her medications for her mental disorders.[79]  She stated she was taking Buspar, Clozapine, Lexapro, and Seroquel.[80]  With respect to symptoms, Ms. Mongelluzzo testified that three to four times per month, she has blank spells that last several hours in which she "will go places, do things and have no memory of doing so."[81]  She further testified that watching television shows sometimes "trigger[s] something," and she has thoughts that the people on television are talking about her.[82]  Additionally, she has anxiety attacks lasting approximately one hour that involve shortness of breath, a pain in her arm, dizziness, shakiness, and an inability to think or act.[83]  Ms. Mongelluzzo stated she experiences these symptoms even while taking medication.[84]  She also testified that the symptoms have impacted her performance in school.[85]

---

[77] A.R. 68–69.

[78] A.R. 68.

[79] A.R. 70.

[80] A.R. 71.

[81] A.R. 71–72.

[82] A.R. 73.

[83] A.R. 74.

[84] A.R. 74.

[85] A.R. 72 ("I had – I was getting a failing grade in math and I had to talk with the school and be removed from that class.  My doctor had to write me a note saying that the stress and workload were causing, affecting my dissociativeness.").  Ms. Mongelluzzo testified that she generally makes B and C grades in school.  A.R. 56.

At the end of the hearing, the ALJ posed hypothetical questions to the VE.  The VE testified that a hypothetical person of Ms. Mongelluzzo's age, education, and work experience who requires "a sit stand option throughout an eight hour workday" and who has the psychological limitations identified in Dr. Worsley's CE report would not be able to perform Ms. Mongelluzzo's past jobs because none of those jobs "would allow for the sit stand option."[86]  However, the VE testified that there are other jobs that exist in the regional and national economies that this hypothetical individual could perform, including cashier, assembly worker, quality control inspector, and office helper.[87]

Ms. Mongelluzzo's attorney then proceeded to question the VE.  The attorney noted that Dr. Worsley did not quantify the extent to which Ms. Mongelluzzo's ability to concentrate and remember some information would be compromised in a work setting.[88]  The attorney then had the following exchange with the VE:

> **Atty:**  Without a quantification of how much that compromise is can you really state as to the effect that those limitations would have on a person's ability to work?  If I were to say for example that the ability to concentrate and remember information would be mildly compromised would that result in a different answer from you as opposed to saying the ability to concentrate and remember some information would be severely compromised?
>
> **VE:**  Right, there would be a big difference in that.
>
> **Atty:**  And we don't know from this language whether it's mild or whether it's severe, do we?

---

[86] A.R. 76–77.  The VE also assumed the hypothetical individual had certain other physical limitations that are not relevant in this appeal.  *See* A.R. 75–76.

[87] A.R. 77.

[88] *See* A.R. 78; *cf. supra* text accompanying notes 48–49 (describing Dr. Worsley's CE report)

**VE:**   No.[89]

The attorney then asked the VE whether a hypothetical individual with the limitations described in Dr. Wadman's assessment would be able to sustain work on a regular and continuing basis, and the VE responded, "They could not."[90]

## IV.   The ALJ's Decision and Ms. Mongelluzzo's Appeal.

After considering all the evidence, the ALJ found that Ms. Clayton was not under a disability from April 9, 2010 through December 23, 2011, the date of the ALJ's decision.[91]   On January 25, 2013, the Social Security Appeals Council denied Ms. Mongelluzzo's request for review.[92]

Ms. Mongelluzzo timely filed this action on March 25, 2013, seeking judicial review of the ALJ's findings pursuant to 42 U.S.C. § 405(g).[93]   Ms. Mongelluzzo asks the Court to reverse the ALJ's decision and remand for the award of disability benefits.[94] Defendant Commissioner of Social Security opposes the requested relief and asks the Court to dismiss the Complaint and enter judgment affirming the ALJ's decision.[95]

---

[89] A.R. 78–79.

[90] A.R. 79–80; *cf. supra* text accompanying notes 57–58 (describing Dr. Wadman's assessment).

[91] A.R. 31.

[92] A.R. 1.

[93] Docket 1 (Compl.).

[94] Docket 1 at 11 (Compl.); *see also* Docket 19 at 42 (Mongelluzzo Br.).

[95] Docket 10 at 2 (Answer); *see also* Docket 21 at 23 (Def. Br.).

**DISCUSSION**

The Social Security Act provides for the payment of SSI to disabled individuals who satisfy certain income and resource eligibility criteria.[96]  Disability is defined as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[97]

The Social Security Commissioner has established a five-step process for determining disability.[98]  At Steps 1 through 4, the claimant bears the burden of proving her entitlement to disability benefits; at Step 5, the burden shifts to the Social Security Commissioner to show there is gainful activity the claimant can perform.[99]

At Step 1, the claimant must show she is not currently engaged in substantial gainful activity.[100]  At Step 2, the claimant must demonstrate that her impairment is "severe," i.e., is an impairment that "significantly limits [her] physical or mental ability to do basic work activities" that has lasted or is expected to last for at least twelve

---

[96] 42 U.S.C. §§ 1381–1382.

[97] 42 U.S.C. § 1382c(a)(3)(A).  This definition of disability for SSI purposes mirrors the definition of disability for DIB purposes.  *See* 42 U.S.C. § 423(d)(1)(A).  Disability regulations for the SSI and DIB programs also mirror each other.  Accordingly, case law dealing with one program is generally relevant to both programs.

[98] 20 C.F.R. § 416.920(a)(4).

[99] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)).

[100] 20 C.F.R. § 416.920(a)(4)(i).

months.[101]   At Step 3, if the claimant proves her impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, then the ALJ must conclude the claimant is disabled.[102]   If not, then the ALJ determines the claimant's residual functional capacity ("RFC"), which is the most work the claimant can still do despite her limitations.[103]   At Step 4, the ALJ uses the RFC to determine whether the claimant is capable of performing her past relevant work.[104]   If the claimant proves she cannot perform her past relevant work, then at Step 5, the Social Security Commissioner must show—based on the claimant's RFC, age, education, and work experience—that the claimant is capable of performing other work that exists in the national economy.[105]   If the claimant can make an adjustment to such other work, she is not disabled.   If she cannot make such an adjustment, then she is considered disabled.[106]

In this case, at Step 1 the ALJ found Ms. Mongelluzzo has not engaged in substantial gainful activity since April 9, 2010.[107]   At Step 2, the ALJ found that Ms. Mongelluzzo has the following severe impairments: "PTSD, dysthymic disorder,

---

[101] 20 C.F.R. § 416.920(a)(4)(ii), (c); 20 C.F.R. § 416.909.

[102] 20 C.F.R. § 416.920(a)(4)(iii).

[103] 20 C.F.R. § 416.945(a)(1).  The ALJ makes the RFC determination based on "all of the relevant medical and other evidence," including "descriptions and observations of [the claimant's] limitations" provided by the claimant and others.  *Id.* § 416.945(a)(3).

[104] 20 C.F.R. § 416.945(a)(4)(iv).

[105] 20 C.F.R. § 416.945(a)(4)(v).

[106] *Id.*

[107] A.R. 25.

dissociative disorder, borderline personality disorder, and obesity."[108]   At Step 3, the ALJ found that Ms. Clayton does not have an impairment or combination of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[109]

The ALJ then determined that Ms. Clayton has the RFC to perform light work[110] "with alternate sitting and standing required throughout an 8-hour workday, and the ability to perform simple and repetitive tasks on a regular basis with regular supervision."[111]   At Step 4, the ALJ relied on the testimony of the VE to determine that Ms. Mongelluzzo is not capable of performing her past relevant work because those jobs would not allow Ms. Mongelluzzo to alternate between sitting and standing throughout the workday.[112]   But at Step 5, the ALJ found that "[c]onsidering [Ms. Mongelluzzo's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [she] can perform."[113]   Specifically, based on the testimony of the VE, the ALJ concluded that Ms. Mongelluzzo can perform

---

[108] A.R. 25.

[109] A.R. 25.

[110] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. § 416.967(b).

[111] A.R. 26.  The ALJ also identified certain other physical limitations not relevant to this appeal.

[112] A.R. 29–30.

[113] A.R. 30.

the jobs of cashier, quality control inspector, and office helper.[114]  Accordingly, the ALJ ruled that Ms. Mongelluzzo is not disabled under the Social Security Act.[115]

## I.    Standard of Review.

The ALJ's denial of benefits to Ms. Mongelluzzo should be set aside "only if it is not supported by substantial evidence or is based on legal error."[116]  An ALJ's determination is based on legal error if the ALJ failed to apply the proper legal standard.[117]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion."[118]  This Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."[119]

## II.    Analysis.

Ms. Mongelluzzo asserts the ALJ's decision should be reversed because (1) the ALJ erred by rejecting Dr. Wadman's opinion in favor of the opinions of non-treating and non-examining psychologists; (2) the ALJ erred by rejecting Ms. Mongelluzzo's symptom testimony without providing clear and convincing reasons; (3) the ALJ's determination of Ms. Mongelluzzo's work capacities is not supported by substantial evidence; and (4) the ALJ exhibited bias when he stated, based on the fact that Ms.

---

[114] A.R. 30–31.

[115] A.R. 31.

[116] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)).

[117] *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("We will affirm . . . if the ALJ applied the proper legal standard . . . .").

[118] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[119] *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

Mongelluzzo was enrolled in school full time, the chances were "slim to none" that he would issue a favorable decision.[120]  The first two of these arguments concern the section of the ALJ's decision in which he explains his RFC determination.  The Court agrees with Ms. Mongelluzzo that in explaining his RFC determination, the ALJ provided legally insufficient reasons for rejecting Dr. Wadman's opinion and Ms. Mongelluzzo's symptom testimony, and the Court concludes that these errors warrant remanding for calculation and award of benefits.  The Court does not reach Ms. Mongelluzzo's third and fourth arguments.

### A. In explaining his RFC determination, the ALJ provided legally insufficient reasons for rejecting Dr. Wadman's opinion and Ms. Mongelluzzo's symptom testimony.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms . . . that are reasonably attributed to a medically determinable impairment.'"[121]  Here, Ms. Mongelluzzo asserts the ALJ erred in his consideration of the evidence by improperly discounting Dr. Wadman's opinion and Ms. Mongelluzzo's symptom testimony.[122]

### i. The ALJ provided legally insufficient reasons for rejecting Dr. Wadman's opinion.

Ms. Mongelluzzo asserts the ALJ erred "by rejecting the assessment of the treating psychiatrist, Beth Wadman, M.D., instead purporting to rely upon the opinion of

---

[120] Docket 19 at 1–2, 19–39 (Mongelluzzo Br.).

[121] *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (quoting SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996)); *see also* 20 C.F.R. § 416.945(a).

[122] Docket 19 at 19–35 (Mongelluzzo Br.).

a one-time examiner, Jacqueline Worsley, Psy.D., and unnamed state agency employees who reviewed a limited record as part of the initial and reconsideration determinations, but did not perform personal examinations."[123]

"By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians."[124]  The Ninth Circuit has held that to reject the uncontradicted opinion of a treating doctor, an ALJ "must state clear and convincing reasons that are supported by substantial evidence."[125]  And to reject the opinion of a treating doctor that is contradicted by another doctor's opinion, an ALJ must provide "specific and legitimate reasons that are supported by substantial evidence."[126]  "The ALJ can 'meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'"[127]

Here, Dr. Wadman opined in her assessment that Ms. Mongelluzzo's mental impairments seriously affect Ms. Mongelluzzo's ability to perform even simple and repetitive tasks on a sustained basis in a routine work setting.[128]  This opinion is contradicted by Dr. Barrons's and Dr. Tomak's case analyses, which state that Ms.

---

[123] Docket 19 at 19 (Mongelluzzo Br.).

[124] *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527).  20 C.F.R. § 404.1527 is a DIB regulation; the corresponding SSI regulation is 20 C.F.R. § 416.927.

[125] *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

[126] *Id.*; *cf.* 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

[127] *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[128] *See supra* note 58 and accompanying text.

Mongelluzzo is able to perform simple, unskilled work.[129]   Accordingly, the Court must determine whether the ALJ provided specific and legitimate reasons supported by substantial evidence for discounting Dr. Wadman's opinion.[130]

The ALJ gave only the following one-sentence explanation for why he discounted Dr. Wadman's opinion: "[Dr. Wadman's] opinion was given less weight because it is unsupported by the greater objective record and inconsistent with the claimant's reported level of functioning."[131]   The two reasons contained in this sentence are insufficiently specific to support the ALJ's rejection of Dr. Wadman's opinion concerning Ms. Mongelluzzo's ability to work.[132]

With respect to the ALJ's first reason—that Dr. Wadman's opinion "is unsupported by the greater objective record"—the Ninth Circuit addressed another

---

[129] *See supra* text accompanying notes 51, 54.

[130] Ms. Mongelluzzo asserts the "clear and convincing" standard should apply because the only opinions contradicting Dr. Wadman's opinion are from non-examining psychologists.  *See* Docket 19 at 21–22 & n.18 (Mongelluzzo Br.).  However, in *Widmark v. Barnhart*, the Ninth Circuit held that the opinion of a non-examining state agency reviewing doctor "may suffice to establish a conflict among the medical opinions," such that the "specific and legitimate" standard applies.  454 F.3d 1063, 1066–67 & n.2 (9th Cir. 2006).

[131] A.R. 29.  The ALJ's decision credits Dr. Barrons's and Dr. Tomak's opinions.  A.R. 29.  However, under Ninth Circuit law, although these opinions establish a conflict among the medical opinions, they alone do not constitute substantial evidence justifying the rejection of Dr. Wadman's opinion.  *See Widmark*, 454 F.3d at 1066 n.2.  The ALJ's decision also credits Dr. Worsley's opinion.  A.R. 29.  However, this opinion does not appear to conflict with Dr. Wadman's opinion and therefore is not a legitimate basis for discrediting Dr. Wadman's opinion.

[132] *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) ("[R]easons must be 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" (quoting SSR 96-2p (July 2, 1996))); *Bergfeld v. Barnhart*, 361 F. Supp. 2d 1102, 1112 (D. Ariz. 2005) (stating ALJ's reasons for rejecting treating physician's opinion—namely, that it was inconsistent "with the greater objective record" and with claimant's "own physical activities as she reported them"— were "insufficiently specific").

ALJ's use of similar language in *Embrey v. Bowen*.[133]   There, the ALJ rejected the opinions of claimant's treating and examining physicians, stating "[t]he opinions . . . are unsupported by sufficient objective findings and contrary to the preponderant conclusions mandated by those objective findings."[134]   The Ninth Circuit held: "[The ALJ] merely states that the objective factors point toward an adverse conclusion and makes no effort to relate any of these objective factors to any of the specific medical opinions and findings he rejects.   This approach is inadequate."[135]   Here, the ALJ's statement that Ms. Wadman's opinion is "unsupported by the greater objective record," without further discussion, is likewise inadequate.[136]

With respect to the ALJ's second reason—that Dr. Wadman's opinion is "inconsistent with the claimant's reported level of functioning"—it appears the ALJ determined that Dr. Wadman's opinion concerning Ms. Mongelluzzo's ability to work

---

[133] 849 F.2d 418 (9th Cir. 1988).

[134] *Id.* at 420–21.

[135] *Id.* at 422.

[136] Defendant asserts that "[b]efore evaluating Dr. Wadman's opinion, the ALJ evaluated and cited to treatment records showing that Plaintiff's symptoms were generally no more than moderate, and discussed Plaintiff's ability to attend college classes, and her ability to maintain a normal and active lifestyle. It is clear that these factors contributed to the ALJ's evaluation of Dr. Wadman's opinion, and the ALJ was not required to repetitively re-list the evidence he had already discussed." Docket 21 at 17 (Def. Br.) (citation omitted).  The Court disagrees.  The ALJ was required to specify what evidence in the record he relied on in rejecting Dr. Wadman's opinion and to explain his decision.  *See Embrey*, 849 F.2d at 421–22 ("The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather that the doctors', are correct.").  And although Defendant provides an analysis in her briefing to this Court of how the record could support a decision to discount Dr. Wadman's opinion, this Court may not rely on that explanation to affirm the ALJ's decision.  *See Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").

was inconsistent with Ms. Mongelluzzo's description of her "ability to function in daily activities including raising a family and going to school full time."[137]  A conflict between a doctor's opinion on a claimant's ability to work and a claimant's activities of daily living can be a legitimate reason for discounting the doctor's opinion.[138]  However, in this case the ALJ did not provide any explanation of how Ms. Mongelluzzo's ability to perform household chores and to attend school would translate into an ability to work full time.[139] Particularly given that the record demonstrates that the stress of school can increase the severity of Ms. Mongelluzzo's symptoms,[140] and that Paradise Valley Community College has taken steps to accommodate Ms. Mongelluzzo's mental impairments,[141] without additional explanation by the ALJ the Court cannot determine the validity of the ALJ's conclusion that there is a conflict between Dr. Wadman's opinion and Ms.

---

[137] *See* A.R. 29.

[138] *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601–03 (9th Cir. 1999) (upholding ALJ decision discounting doctors' opinions based in part on claimant's daily activities).

[139] *Cf. Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("[I]f a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities."); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."); *Geiger v. Colvin*, No. 3:13-cv-05277-KLS, 2014 WL 1328511, at *4 (W.D. Wash. Mar. 31, 2014) (holding ALJ erred in rejecting doctor's assessment of claimant's work-related capabilities based on claimant's social activities because ALJ did not explain how those social activities were "indicative of the existence of transferable work skills").

[140] *See supra* note 85.

[141] *See supra* Factual & Procedural Background Part II.C (discussing Dr. Bastani's Certification of Psychological Disability and Mike Zajac's statement).

Mongelluzzo's description of her daily activities.[142]   Accordingly, the ALJ's second stated reason for discounting Dr. Wadman's opinion is also insufficiently specific.

Therefore, the Court concludes that the ALJ erred by failing to provide specific and legitimate reasons for discounting the opinion of Ms. Mongelluzzo's treating physician, Dr. Wadman.

ii. *The ALJ provided legally insufficient reasons for discounting Ms. Mongelluzzo's symptom testimony.*

Ms. Mongelluzzo asserts the ALJ also erred in his RFC determination by rejecting Ms. Mongelluzzo's symptom testimony without providing clear and convincing reasons.[143]

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, an ALJ engages in a two-step analysis."[144]   First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the . . . symptoms alleged."[145]   If there is such evidence, then at the second step of the analysis, unless there is affirmative evidence that the claimant is malingering, the ALJ must give "specific, clear and convincing reasons" before discrediting the claimant's testimony.[146]

---

[142] *Cf. Geiger*, 2014 WL 1328511, at *4 ("The record also does not clearly establish that plaintiff's performance both academically and socially during the period of alleged disability is at odds with [the doctor's] assessment of his work-related capabilities.").

[143] Docket 19 at 29 (Mongelluzzo Br.).

[144] *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

[145] *Id.* (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).

[146] *Id.* (quoting *Vasquez*, 572 F.3d at 591).   Defendant asserts the standard of review that courts should apply to an ALJ's credibility findings was articulated by the Ninth Circuit in *Bunnell v. Sullivan*.   Docket 21 at 10 (Def. Br.) ("The *Bunnell* court explained that an ALJ's credibility

"In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'"[147]   For example, the ALJ may consider the claimant's reputation for truthfulness, prior inconsistent statements, inconsistencies between the claimant's testimony and her conduct, an unexplained or inadequately explained failure to seek treatment, the claimant's daily activities, the claimant's work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the claimant's symptoms.[148]

Here, the ALJ found under step one of the credibility analysis that Ms. Mongelluzzo's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."[149]   Then, at step two, the ALJ found that Ms. Mongelluzzo's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[150]

---

findings, 'properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc))).  Defendant maintains that the "clear and convincing reasons" standard has been articulated by three-judge panels, and only an en banc panel may overturn *Bunnell*.  Docket 21 at 11 n.9 (Def. Br.).  Courts in this district have previously rejected this argument.  *See, e.g.*, *Valenzuela v. Colvin*, No. CV 11-812-TUC-HCE, 2013 WL 1092886, at *4 n.4 (D. Ariz. Mar. 15, 2013).  And in any event, the ALJ's credibility determination in this case fails under either standard.

[147] *Molina*, 674 F.3d at 1112 (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)).

[148] *See Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007); *Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002).

[149] A.R. 28.

[150] A.R. 28.  The Court agrees with Ms. Mongelluzzo's assertion that this boilerplate statement is inappropriate because it "implies that ability to work is determined first and then is used to

The ALJ did provide some discussion of why he discounted Ms. Mongelluzzo's symptom testimony.  The ALJ states that Ms. Mongelluzzo "chose school over work, which undermines her fundamental claim of disability."[151]  And the ALJ states that Ms. Mongelluzzo indicated to Dr. Worsley that she maintains "a very busy schedule during an average day."[152]  However, Ms. Mongelluzzo's testimony concerning her schooling and her statements to Dr. Worsley concerning her daily activities do not directly contradict her testimony regarding her symptoms and therefore should not detract from her credibility.[153]  In this regard, the Ninth Circuit has held that a claimant's daily activities may be grounds for an adverse credibility determination only if those activities "indicat[e] capacities that are transferable to a work setting."[154]  Here, as discussed in the previous section, the ALJ did not explain how Ms. Mongelluzzo's daily activities translate into an ability to work full time.  Without additional explanation, the fact that Ms. Mongelluzzo attends school and does chores is not a clear and convincing reason for discounting her credibility.

---

determine the claimant's credibility."  *See* Docket 19 at 32–33 & n.23 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)); *see also Vasquez v. Astrue*, No. CV11-2406-PHX-GMS, 2013 WL 491977, at *8 (D. Ariz. Feb. 8, 2013) ("The first reason—that [claimant's] statements 'are not credible to the extent they are inconsistent with the above residual functional capacity assessment'—is circular.  The ALJ cannot determine the RFC and then look at [claimant's] statements; the RFC is supposed to incorporate those statements.").

[151] A.R. 27.

[152] A.R. 28.

[153] *See Orn*, 495 F.3d at 639 (claimant's daily activities must contradict claimant's testimony in order to form the basis for an adverse credibility determination).

[154] *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).

The ALJ's decision also discusses some of Ms. Mongelluzzo's mental health treatment records, as well as Dr. Worsley's CE, but it does not explain how those records contradict Ms. Mongelluzzo's symptom testimony.[155]  Finally, the ALJ's decision points to the opinions of Drs. Barrons and Tomak.[156]  But as discussed above, the ALJ improperly credited these opinions without providing a sufficient basis for discounting the contradictory opinion of Ms. Mongelluzzo's treating physician, Dr. Wadman.

Therefore, the Court concludes that the ALJ erred by failing to provide clear and convincing reasons for discounting Ms. Mongelluzzo's symptom testimony.

### B.  The Court will remand for calculation and award of benefits.

In making his RFC determination, the ALJ did not provide specific and legitimate reasons for discounting Dr. Wadman's opinion, nor did he provide clear and convincing reasons for discounting Ms. Mongelluzzo's symptom testimony.[157]  The Court must

---

[155] *See* A.R. 28–29.  If anything, the medical evidence supports Ms. Mongelluzzo's symptom testimony.  *See supra* Factual & Procedural Background Part II.A & B.

[156] A.R. 29.

[157] Additionally, the Court observes that the ALJ's RFC determination does not precisely match up with the limitations of the hypothetical individual the ALJ questioned the VE about in order to make his determinations at Step 4 and Step 5.  As previously discussed, the ALJ questioned the VE about a hypothetical individual with the psychological limitations identified in Dr. Worsley's CE report.  A.R. 76.  However, that report does not provide that Ms. Mongelluzzo has the ability to perform simple and repetitive tasks on a sustained basis in a work setting; rather, it states that Ms. Mongelluzzo's ability to concentrate and remember some information would be "compromised" in a work setting.  A.R. 408.  And although the VE initially testified that there are jobs that could be performed by a hypothetical individual with the limitations identified in Dr. Worsley's CE report, the VE subsequently conceded that Dr. Worsley did not quantify the extent to which Ms. Mongelluzzo's ability to concentrate and remember would be "comprised," and that there is a big difference between the work capabilities of an individual whose abilities are "severely compromised" as opposed to "mildly compromised."  *See supra* text accompanying notes 86–90.  For this reason, the Court also concludes that the ALJ's decision to deny benefits to Ms. Mongelluzzo is not supported by substantial evidence.

therefore determine whether to remand for calculation of benefits, as Ms. Mongelluzzo requests, or whether to remand for further proceedings.

Under the Ninth Circuit's "credit-as-true" doctrine, a court should remand for calculation and award of benefits when (1) the ALJ failed to provide legally sufficient reasons for discounting the testimony of a claimant and/or treating physician; (2) "there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such [testimony] credited."[158]

In this case, it is clear from the record that the ALJ would be required to award benefits to Ms. Mongelluzzo if her testimony and Dr. Wadman's testimony are credited. The VE testified at the hearing that a hypothetical individual with the limitations described in Dr. Wadman's assessment, which are consistent with the symptoms testified to by Ms. Mongelluzzo, would not be able to work on a regular and continuing basis.[159]   Accordingly, the Court will remand this matter for the calculation and award of benefits.

---

[158] *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  Defendant asserts "the credit-as-true rule is inconsistent with both the Social Security Act and Supreme Court precedent."  Docket 21 at 22 n.15 (Def. Br.).  In *Vasquez v. Astrue*, the Ninth Circuit recognized that "a split of authority has developed over whether the rule is mandatory or discretionary in [the Ninth] Circuit" in cases such as this where there are no outstanding issues that must be resolved before a disability determination can be made.  *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2008).  However, recent memorandum dispositions issued by the Ninth Circuit have applied the credit-as-true doctrine even when there are no outstanding issues that must be resolved. *See, e.g.*, *Om v. Colvin*, 545 F. App'x 665, 667–68 (9th Cir. 2013); *Deleo v. Astrue*, 374 F. App'x 743, 744 (9th Cir. 2010); *Woody v. Astrue*, 357 F. App'x 765, 767 (9th Cir. 2009); *cf.* Fed. R. App. P. 32.1 (permitting citation of memorandum dispositions issued on or after January 1, 2007).  Consistent with these dispositions, this Court will apply the credit-as-true doctrine in this case.

[159] A.R. 79–80.

**CONCLUSION**

For the reasons discussed above, it is hereby ORDERED that:

1.  This matter is REVERSED and REMANDED to the Commissioner of Social Security for the calculation and award of benefits; and

2.   The Order at Docket 26 setting oral argument in this matter is VACATED.

DATED this 23rd day of April, 2014, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
United States District Judge
